IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 28, 2015 Session

**PAUL STACKHOUSE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hamblen County**
**No. 13CR112     John F. Dugger, Jr., Judge**

_____

**No. E2014-01328-CCA-R3-PC – Filed July 17, 2015**

_____

A Hamblen County jury convicted the Petitioner, Paul Stackhouse, of aggravated sexual battery, a Class B felony, and the trial court sentenced him to nine years in the Tennessee Department of Correction. The Petitioner appealed, and this Court affirmed the conviction. *State v. Paul M. Stackhouse*, No. E2010-01972-CCA-R3-CD, 2011 WL 5620925, at *1 (Tenn. Crim. App., at Knoxville, Nov. 18, 2011), *perm. app. denied* (Tenn. March 7, 2012). Thereafter, the Petitioner filed a petition for post-conviction relief, and, after a hearing, the post-conviction court issued an order denying the petition. On appeal, the Petitioner maintains that he received the ineffective assistance of counsel. After a thorough review of the record and relevant law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and TIMOTHY L. EASTER, JJ., joined.

Greg W. Eichelman, District Public Defender; and D. Clifton Barnes, Assistant District Public Defender, Morristown, Tennessee, for the appellant, Paul Stackhouse.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Dan E. Armstrong, District Attorney General; and Kimberly Morrison, Assistant District Attorney General, for the appellee, State of Tennessee

**OPINION**
**I. Facts**

A Knox County grand jury indicted the Petitioner for aggravated sexual battery of his granddaughter. This Court summarized the facts presented at trial as follows:

The State called the victim—one of the [Petitioner]'s granddaughters—as its first witness. The victim testified that in 2006, her parents had been divorced for about two years. The victim testified that although she lived with her mother, she still had visitation with her father, and that her father lived with his parents, the [Petitioner] and his wife. The victim testified that her visitation period included the entire summer, during which time she was living in her own room in the [Petitioner]'s house in Hamblen County.

During this summer visitation period, the victim testified that sometime during June of 2006, she had just finished taking a shower in the bathroom connected to the [Petitioner]'s bedroom when the [Petitioner] entered the bathroom and started touching her breasts. She further testified that he carried her into his bedroom, laid her down on the bed, and performed oral sex on her. The victim specified that the oral sex included the [Petitioner] placing his mouth on her vagina and licking her. The victim testified that on this occasion, while the oral sex was occurring, the [Petitioner]'s wife, Doris Stackhouse, entered the room and saw them on the bed. According to the victim, Doris Stackhouse was speechless, but a surprised expression washed over her face before she ran out of the room. The victim testified that after this interruption, the [Petitioner] stopped what he was doing and chased after his wife. The victim testified that after the [Petitioner] left, she dressed herself and ran down the hall to her own bedroom.

On cross-examination, the [Petitioner]'s counsel asserted that the victim's father remarried in January 2006 and that he moved out of his parents' house following his remarriage. Defense counsel asked the victim whether the sexual contact she had just described had occurred before her father had moved out of the home. The victim stated that she believed it had but that, regardless of whether or not her father was still living there, she spent considerable time staying at her grandparents' house during June of 2006. The [Petitioner]'s counsel brought to the victim's attention earlier statements made to investigators and on the stand to the effect that the act of cunnilingus at issue had occurred while her father was still living in his parents' home. The victim then testified that if the sex act had not happened in June of 2006, it must have happened in 2005. The [Petitioner]'s trial counsel proceeded to impeach the victim with statements made to investigators in 2008 to the effect that nothing had happened between her and the [Petitioner]. Finally, defense counsel raised the issue of a letter written by the [Petitioner] in 2008 that seemed to indicate that the sex act at issue had occurred three years earlier. The witness agreed that if

2

she made that statement in 2008, then it sounded correct to her that the sex act would have occurred in 2005. Ultimately, the victim answered yes to a statement made by the [Petitioner]'s counsel that the sex act at issue did not occur in June of 2006.

On re-direct examination, the victim testified that she was under the age of thirteen when the sexual contact that was witnessed by the grandmother occurred. The victim further testified that when investigators initially questioned her regarding the incident she denied it on several occasions because she was afraid of what might happen to her and to her grandfather.

The State next called the [Petitioner]'s wife, Ms. Doris Stackhouse. Ms. Stackhouse testified that she had been married to the [Petitioner] for forty-seven years and was married to him in June of 2006. She further testified that only herself and her husband were living in their home in June of 2006, and that none of their grandchildren ever stayed with them, even intermittently, during that time. The witness specifically testified that the victim would never have stayed with them at any point during June of 2006. Following this testimony, the prosecution requested and received permission to treat Ms. Stackhouse as a hostile witness. During the ensuing cross-examination, Ms. Stackhouse denied that the victim ever visited the residence during June of 2006, denied ever seeing her husband with the victim in their bedroom, and denied ever seeing them together on a bed while the victim was nude. Concerning whether she had ever walked in and seen the victim naked on their bed, she stated that "there is a possibility that that may have happened, but it's not in my memory bank."

The State then questioned Ms. Doris Stackhouse as to whether she could recall going to visit Dr. Kim Keinath (her therapist) on September 15, 2006. Ms. Stackhouse replied that she had been a patient of Dr. Keinath "on and off" for some time but could not recall the specific dates of her appointments. The State asked Ms. Stackhouse if she could recall ever telling Dr. Keinath that she thought her husband was abusing the victim. Ms. Stackhouse stated that she never made any such statement and specifically denied telling Dr. Keinath that she had walked into the bedroom and seen her granddaughter naked on the bed being fondled by her husband.

The State then called Dr. Kim Keinath as a rebuttal witness. The defense objected on grounds that this impeachment testimony was not permissible during the State's case-in-chief and also objected on the grounds that the witness's testimony would include allegations of crimes

3

that were outside of the one alleged in the Bill of Particulars. Following a jury-out hearing, the trial court decided to allow the testimony.

Dr. Keinath took the stand and testified that she had a Ph.D. in clinical psychology and had been treating Ms. Doris Stackhouse as a patient since approximately 1993. The witness testified that on September 15, 2006, Ms. Stackhouse came in to a session with her and said, "my life has changed dramatically." Ms. Stackhouse proceeded to tell her that she had walked into her bedroom and seen her granddaughter lying on the bed, partially unclothed, and that her husband was down between her granddaughter's legs. Dr. Keinath further testified that Ms. Doris Stackhouse stated: "I think my husband has been sexually abusing my granddaughter and I think this has been going on for a very long time." Following this statement, the trial court instructed the jury that with regard to the witness' testimony concerning "something" going on "for a very long time," they were not to consider anything concerning any other incidents but were only to consider the particular incident that was alleged and charged in the indictment.

Dr. Keinath stated that she advised Ms. Stackhouse to report this incident to the Department of Children's Services (D.C.S.) and explained that if she would not do so, then the doctor would report it herself. Dr. Keinath testified that the rest of the session was spent discussing the possibility of making a report to D.C.S. Dr. Keinath testified that Ms. Stackhouse stated that while she was very angry with her husband and would ensure that he was never around any of the children, she thought that the [Petitioner]'s behavior might be secondary to his dementia. At some point after this session, when she concluded that Ms. Stackhouse was not going to report the incident to D.C.S., Dr. Keinath stated that she called and reported the incident herself.

On cross-examination, Dr. Keinath stated that nothing in her records spoke to whether or not this sexual contact occurred in June of 2006. Moreover, nothing in her records identified the victim as being the particular granddaughter who was abused by the [Petitioner] during the incident referenced by Ms. Stackhouse during her therapy session.

Following this testimony, the State presented the testimony of Dr. Peter Reardon, an expert in pediatric gynecology. During a jury out hearing, the defense objected to his testimony and report on the ground that it was "fraught with indications of other crimes." Specifically, the [Petitioner] complained that the doctor's report, which indicated that the victim's hymen had been torn, indicated that this tearing could have been

4

the result of penetration by either a tongue or a digit. The trial court agreed that Dr. Riordan could not opine regarding whether or not any digital penetration of the victim's vagina had occurred, because this proof would go beyond the crime specified in the Bill of Particulars.

When the jury returned, Dr. Riordan testified that he had performed an examination of the victim in November of 2006, and that his examination revealed that the victim's hymen had been torn at some earlier point in time. Dr. Riordan further testified that the tearing of the victim's hymen had healed. Over the [Petitioner]'s objection, Dr. Riordan testified that this tearing could possibly have been the result of oral sex or oral penetration.

On cross-examination, Dr. Riordan testified that it was not possible to determine the exact time when the victim's hymen had been torn. He testified that based on the hymen's healing process, he would assume that the injury occurred more than two months prior to his examination, and possibly three months. Dr. Riordan also testified that a number of different things can break a hymen, including a fall, and that it was possible for a hymen to be torn without any vaginal penetration. Following the doctor's testimony, the State rested.

The [Petitioner] moved to have Dr. Riordan's testimony struck as speculative. This motion was denied. The [Petitioner] also moved for a judgment of acquittal on the basis that the State had failed to prove the date of the crime as specified in the Bill of Particulars. The trial court ruled that any discrepancy between the victim's testimony on direct examination that the event happened in 2006 and her testimony on cross-examination that the event happened in 2005 went to her credibility as a witness and was an issue for the jury to decide. After denying the [Petitioner]'s motion for a judgment of acquittal, the trial court held a jury out hearing during which the [Petitioner] was advised of and waived his right to testify in his own defense pursuant to the procedures described in *Momon v. State*, 18 S.W.3d 152, 162-64 (Tenn. 1999).

The defense called Ms. Sheila Barnett, a child protective services worker for the Department of Children's Services, as its first witness. Ms. Barnett testified that she interviewed the victim alone at her school in Cocke County on November 3, 2006. At this initial interview, the victim denied being touched inappropriately by anyone. Ms. Barnett testified that, during this interview, she told the victim that if she remembered anything later or if she was afraid to talk about anything during the interview, the victim should write her a letter. Ms. Barnett stated that at some point

5

following this interview, she was made aware that the victim had written a letter that she wanted Ms. Barnett to read. That letter, dated December 1, 2006, stated that one day the [Petitioner] had licked her "down there" and that her grandma had come in and seen it. The letter indicated that this event had happened three years earlier. The witness testified that, during a subsequent interview concerning this letter, the victim confirmed to her that the sexual contact described in the letter had occurred and claimed that it happened about three years earlier (which would have placed it sometime during December of 2003).

The second witness for the defense was the lead investigator of the case, Detective Pam Taylor of the Hamblen County Sheriff's Department. Upon being shown some notes she took during her investigation, she identified a place on those notes that reflected that the particular sexual act between the grandfather and the victim that was witnessed by the grandmother occurred during the summer of 2005.

On cross-examination, Detective Taylor identified two additional places in her notes in which the sexual contact that was witnessed by the grandmother was labeled as having occurred during the "summer of 2005/2006." The detective further admitted that it was possible that the sexual contact could have occurred in the summer of 2006. On redirect, Detective Taylor re-read a portion of her notes, which stated that several people were "in the house when grandma caught grandpa performing oral sex. [A male] was cooking, summer 2005."

The defense next called Ms. Doris Stackhouse as a witness. Ms. Stackhouse testified that during most of June of 2006, she and her husband were in Maryland and that at one point the [Petitioner] was hospitalized there. Ms. Stackhouse testified that she had kept certain travel receipts for tax purposes so that she could deduct the couple's trip to Maryland as a business expense. Ms. Stackhouse testified that the victim was never in her home in June of 2006, and that she had receipts dated June 2, 2006, through at least June 14, 2006, reflecting that the couple was traveling out-of-state. Ms. Stackhouse also testified that the [Petitioner] was hospitalized out-of-state from June 10, 2006 to June 16, 2006, and she produced hospital documents reflecting those dates. Ms. Stackhouse stated that the couple's trip to Maryland continued until June 20, 2006, and that the [Petitioner] was extremely ill when they arrived back at home. The witness testified that the [Petitioner] was hospitalized again on July 3, 2006. She testified that, during the intervening time, the [Petitioner] was a very sick man who "couldn't lift his head off the pillow."

6

Following her testimony, the State called Mr. Teddy Collingsworth of the District Attorney General's Office for the Third Judicial District as a rebuttal witness. Investigator Collingsworth testified that he met with the victim in the fall of 2007, in an attempt to figure out when the sexual contact witnessed by the grandmother had occurred. According to his testimony, the victim stated that the sexual contact at issue happened in the summer between her seventh and eighth grade school years, which the investigator stated would have been in the summer of 2006. On cross-examination, however, the investigator stated that, according to his notes, if the incident occurred between the victim's seventh and eighth grade years, it would have occurred during the summer of 2007.

*Stackhouse*, 2011 WL 5620925, at \*1-5. After hearing the evidence, the jury convicted the Petitioner of aggravated sexual battery, and the trial court sentenced the Petitioner to serve nine years in the Department of Correction. The Petitioner appealed his conviction, which was affirmed. *Id.*

The Petitioner filed a timely post-conviction petition claiming that he had received the ineffective assistance of counsel because his attorney, ("Counsel"), allowed Ms. Stackhouse to be present at meetings with Counsel and the Petitioner and because Counsel failed to "advise petitioner of his right to testify under the Sixth Amendment and [did] not conduct a proper 'Momon' hearing." The post-conviction court appointed the Petitioner an attorney and held a hearing. At the hearing, the post-conviction court admitted the trial transcript into evidence.

The Petitioner testified that he was seventy-seven years old at the time of the post-conviction hearing. He stated that, during Counsel's representation of him, he spent approximately fifteen or twenty minutes alone with Counsel. All of the other interactions with Counsel included the Petitioner's wife. The Petitioner stated that, at the time of Counsel's representation, the Petitioner had been diagnosed with Alzheimer's, Parkinson's, diabetes, and high blood pressure. The Petitioner took medications for his illnesses but said that the medications did not affect his ability to communicate with other people. At the time of the post-conviction hearing, the Petitioner still took the high blood pressure medication, but he no longer took the medications prescribed for Alzheimer's and Parkinson's because "the prison [ ] took them away." Despite not taking these medications, he stated that he "[a]bsolutely" remembered the events surrounding the trial clearly.

The Petitioner testified that Counsel arranged for a mental evaluation of the Petitioner in August 2009 at "Lakeshore Medical Facility." Counsel told the Petitioner that, while at the facility, he should "be lethargic and not answer the questions." The Petitioner stayed at the "Lakeshore Medical Facility" for seven days during this

7

evaluation. As a result of the evaluation, it was determined that the Petitioner was competent to stand trial. The Petitioner stated that Counsel never explained to him why he was to be evaluated, and he only learned of the evaluation through his wife.

The Petitioner testified that he had three one-hour "sessions" with Counsel, during which his wife always accompanied him. The Petitioner recalled that, during these sessions when Counsel would ask a question, the Petitioner's wife would answer for him, preventing the Petitioner from answering the questions. He said this was the "general pattern" of communication throughout Counsel's representation. At trial, Counsel told the Petitioner that he "did not want [the Petitioner] to testify." Counsel further instructed the Petitioner to sit at the table "completely lethargic, not look around, not talk about anybody," or express "any enthusiasm, or sadness or remorse." The Petitioner said that he complied with Counsel's instruction to "[j]ust sit there and be a vegetable."

The Petitioner testified that Counsel never discussed with him his Fifth Amendment right not to testify. He explained that he was only told that he was not going to testify. The Petitioner recalled being asked by the trial court at trial about whether he understood his Fifth Amendment rights and that he answered in the affirmative. He maintained, however, that Counsel did not discuss his Fifth Amendment rights with him.

The Petitioner testified that he did not commit the crime for which he was charged. He said that his wife was sitting with him when he told Counsel about what had actually occurred, and his wife had agreed with his "story." The Petitioner stated that he wanted to testify because he "had nothing to hide" and was innocent of the charged offenses. He said that Counsel would not allow him to communicate with Counsel at all during the trial.

The Petitioner testified that he did not meet with Counsel at all in the month leading up to his trial because he was out of town. He explained that Counsel told his wife to "get out of sight, travel so that the DA could not subpoena her." The Petitioner said that he did not hear this directly from Counsel, but it was conveyed to him through his wife who had spoken with Counsel. He stated, "All communications went through my wife."

The Petitioner testified that, after the first couple of meetings with Counsel, he felt as though Counsel represented his wife's interests and not his. He explained that all telephone conversations took place between Counsel and his wife. Further, he thought that his wife's admission to "an institution" and the fact that she was "declared mentally insane" should have been presented to the jury since the State relied on his wife's statements to her therapist to convict him.

On cross-examination, the Petitioner confirmed that it was on only one occasion where he met with Counsel outside the presence of his wife. He agreed that he never

8

requested that he meet with Counsel without his wife. The Petitioner stated that he told Counsel that he would prefer that Counsel call him directly and not his wife. The Petitioner maintained that he was unable to meet with Counsel to prepare for the trial because he was "out of town" as Counsel had instructed. He said that his wife told him that they were to leave town to avoid a summons, but he agreed that his wife had already received a summons by the time they left town. When asked why he did not choose to remain home and prepare for trial, the Petitioner explained that he went with his wife because she did not have much experience with driving their "motor home."

Counsel testified that he had practiced law in Morristown, Tennessee, since 1977 and handled "many" criminal cases during his career. Counsel stated that he often met with the Petitioner and his wife together because the Petitioner's wife drove the Petitioner. He stated that he met with the Petitioner alone on more than one occasion but could not recall a specific number. The Petitioner was indicted in January 2008, and the trial was held in July 2010. Counsel initially met with the Petitioner frequently, but, following his investigation of the case, Counsel met with him every two to three months. As the trial date approached, Counsel once again met more frequently with the Petitioner in preparation for trial.

Counsel testified that he discussed potential defenses with the Petitioner and his wife. Counsel recalled that the State had "problems" with the specific time of the offense. He realized this during his investigation of the case and filed a motion for a bill of particulars and a motion to exclude evidence of other crimes. Ultimately, Counsel decided to pursue an alibi defense using the receipts from campgrounds and hotels indicating the Petitioner and his wife were in another State during the time of the alleged offense.

Counsel testified that he did not believe the Petitioner testifying against his granddaughter was a "good option." He, however, advised the Petitioner that he could testify at trial and "the ultimate choice" whether to testify or not was the Petitioner's. Counsel noted some concern that the Petitioner was not always "coherent" during their meeting but agreed that the Petitioner was evaluated as competent to stand trial. Counsel confirmed that he explained the purpose of the evaluation with the Petitioner before the Petitioner went to Lakeshore Mental Health Institute for the evaluation. Counsel denied telling the Petitioner how he should behave during the evaluation. He further denied advising the Petitioner to leave town the week before the trial. He explained that the Petitioner and his wife asked if they could travel to Maryland to see their son. He told the couple that it was "fine" but to be back in town by the trial date.

On cross-examination, Counsel testified that he often spoke with the Petitioner's wife on the phone. He said that he would call the Petitioner's phone, talk to the Petitioner, and then the Petitioner would hand the phone to his wife. As to Mrs. Stackhouse's attendance during his meetings with the Petitioner, Counsel explained that

9

Mrs. Stackhouse drove the Petitioner because he was not to drive while taking his prescribed medications. Counsel agreed that Mrs. Stackhouse "talked a lot" during the meetings. Counsel agreed that even though the Petitioner's evaluation indicated he was competent to stand trial, Counsel still questioned the Petitioner's competence. Counsel confirmed that he was aware that the Petitioner was taking medication for Parkinson's disease and Alzheimer's.

The Petitioner testified on rebuttal that he drove "all the time" during the years leading up to his trial. He stated that all communication with Counsel about the trip before trial and his mental evaluation was done through his wife. His wife would speak with Counsel and then convey the information to the Petitioner. The Petitioner stated that after fifty-one years of marriage, upon his conviction, his wife sought a divorce.

In a written order, the post-conviction court made the following findings:

> The Court finds Petitioner is not credible when he alleged that [Counsel] never prepared nor discussed a defense with him. The evidence clearly shows that [Counsel] filed a Bill of Particulars to get the State to commit to a certain event or time frame for the offense. Ms. Stackhouse had receipts and tax records to establish an alibi defense that Petitioner and his wife were out of state at the time the offense was alleged to have occurred. The Court finds that Petitioner knew he had the right to testify because [Counsel] testified they discussed attacking the credibility of the victim, Petitioner's granddaughter. In addition, on page 89 of Exhibit 2 (trial transcript) [Counsel] asked Petitioner outside the presence of the jury: "And I have told the Court you're not going to testify. And do you agree with that?" The [Petitioner] answered; "Yes". [sic] It is clear to the Court that Petitioner made an unequivocal response and decision that he was not testifying.

> Petitioner alleged that [Counsel] told him to get out of town with his wife before trial and to act nonresponsive at the mental evaluation and trial. The proof clearly shows that Ms. Stackhouse told her husband how to act and Petitioner followed her instructions. Petitioner cannot complain about his conduct when he willingly acted a certain way to deceive everyone.

> The Court finds that [Counsel] is a very experienced trial attorney. [Counsel] was faced with a difficult case where a young girl testified how her grandfather sexually abused her and Petitioner's wife walked in during the sexual abuse and reported it to her psychiatrist, Dr. Keinath. [Counsel] counseled with Petitioner, investigated the case, filed the appropriate motions and did the best he could to represent Petitioner. Under the guidelines of Baxter v. Rose, 523 S.W.932 (Tenn. 1975) and Strickland v.

10

Washington, 466 U.S. 668 (1984), the Court finds that Petitioner received effective assistance of counsel by his attorney, [Counsel].

For the foregoing reasons, the Court finds that Petitioner failed to carry the burden under Tennessee Code Annotated § 40-30-110(f) of proving by clear and convincing evidence the alleged ground in his Petition for Post-Conviction Relief.

It is from this judgment that the Petitioner appeals.

## II. Analysis

The Petitioner asserts that he received the ineffective assistance of counsel because Counsel "failed to meet with [P]etitioner one on one." He further asserts that Counsel was ineffective for "not allowing petitioner to testify" and for failing to advise the Petitioner of his right to testify. The State asserts that the Petitioner has waived review of his issues for failure to cite to the record in his argument and, in the alternative, that the Petitioner has failed to show he is entitled to post-conviction relief.

Counsel risks waiver by failing to cite in his brief to the exact portion of the original trial record where Counsel's alleged deficient conduct occurred. "Failure to cite to any relevant authority in support of his argument and his failure to cite to appropriate references to the record constitutes waiver." *State v. Maurice Leonard*, No. M2006–00136-CCA-R3-CD, 2007 WL 957199, at *6 (Tenn. Crim. App., at Nashville, March 27, 2007) (citing Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b)). However, in the interest of justice, we will address the Petitioner's argument.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

11

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a

different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad,* 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

The evidence does not preponderate against the post-conviction court's findings. The Petitioner attended meetings with Counsel with his wife, who drove him to the meetings. The Petitioner admitted that he never told Counsel that he did not want his wife present during these meetings. Counsel testified that, on some occasions, he met with the Petitioner alone and when he would call the Petitioner's telephone, the Petitioner would hand the phone to Ms. Stackhouse. Therefore, the Petitioner has not proven by clear and convincing evidence that Counsel was ineffective in this respect.

As to the Petitioner's decision whether to testify at trial, Counsel testified that he discussed the Petitioner's right to testify with him and the post-conviction court found Counsel's testimony credible. Counsel stated that he did not think it best for the Petitioner to testify against his granddaughter but that it was the Petitioner's decision whether or not to testify. The record of the *Momon* hearing supports Counsel's testimony and the post-conviction court's findings on this issue. Therefore, the evidence does not preponderate against the post-conviction court's findings as to the Petitioner's decision not to testify at trial.

It appears that the Petitioner also asserts that Counsel failed to "conduct a proper '<u>Momon</u>' hearing." This issue is not raised in the Petitioner's petition nor was it addressed during the post-conviction hearing. Because has not been previously raised, this Court will not now address it. *See Cone v. State*, 747 S.W.2d 353, 356 (Tenn. Crim. App. 1987).

Accordingly, the Petitioner has failed to show by clear and convincing evidence that Counsel was deficient and that the deficiency prejudiced the defense. The Petitioner is not entitled to relief.

### III. Conclusion

13

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly dismissed the Petitioner's petition for post-conviction relief.  Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE